Okay. I think we're ready to proceed. Thank you. May it please the Court, Counsel, my name is Peter Mercereau and I represent the Appellant School District in this case. With the Court's indulgence, I would like to reserve five minutes for rebuttal. Your Honors, we believe the key to this case is the government speech doctrine. But even if a forum analysis applies, we believe the results should have been the same, which is the granting of the district's motion for summary judgment. Counsel, I'd like to ask you a sort of a 30,000-foot level question about how we should go about analyzing this case. And for the purpose of this question, I want you to assume that the ERB does not have exclusive jurisdiction. Shouldn't we be, excuse me, looking at the state constitutional claim first? I mean, that is the typical way, as you're well aware, in Oregon at least, as to how decision-making is done. You look first to the state constitution, and if it doesn't protect the right, only then do you look at the federal constitution. Why wouldn't we follow that construct here? And perhaps never reach the First Amendment question. We're more than happy to follow that construct, Your Honor. I don't have a negative answer to your question. I would believe that at least the briefing that has been done before you has certainly focused, for the most part, on the federal constitutional claims. We have also briefed the state claims. We do believe the claims under the Oregon Constitution are preempted by the administrative tribunal, which is the ERB. But even if ---- Well, I'd like you to assume for my questions that that is not the case, as it's not really a labor, strictly a labor law question here. It's a speech question. But under Plowman and Robertson and Moser and the other Oregon cases, how do you win once we look at the merits of those claims? I suggest the answer is with the Higgins v. DMV case of 2003. And in that case, which was a specialty license plate case, much like Walker, much like the Arizona case I'll talk about in a moment, the Oregon Supreme Court upheld the authority of DMV to reject a proposed specialty plate. And we believe, Your Honor, had the Walker case and the Sumim case been decided by the time the Oregon Supreme Court looked at that case in 2003, they would have based their analysis on the government speech doctrine or the factors used in those cases. I don't understand how you could view this, what happened here, as being government speech. These were private individuals who sought to speak in a public place, but I don't understand how any observer would consider the back and forth about union side, management side, as being government speech. Could you explain that? Well, remember, this was not a public forum. What we're talking about here is school district property only. This is a non-public forum. Right, but for it to be government speech, a reasonable observer would have to think that it's the government speaking, regardless of the nature of the forum. And I guess what I'm having trouble with is seeing how the statements of individual members of the union or supporters of the union would be seen by a reasonable observer as representing the government's speech. This is our response today, Your Honor, and that's one of the three Walker factors that the Supreme Court set out in determining government speech. Namely, is there an identity in the eyes of the public with the public speaker and the forum? And our argument is that for the constituency in Eagle Point, the taxpayers, if you will, the patrons of that school district, when they see striking teachers with banners, bullhorns, placards, on district campus as opposed to on the sidewalks where they were blocking ingress and egress, there is an identity and an assumption, we believe, that one could infer that the school district has allowed in the middle of the collective bargaining process in dealing with the strikers the teachers to come onto the property and display their messages, which according to Oregon law, when a strike is involved, are to induce and coerce changes in conditions of employment. So the speech that you're saying might be interpreted by the public as being government speech is not the message being conveyed by the strikers. I mean, nobody would believe that the school district is supporting the strikers in its strike against the school district. So are you with me so far? Yes. So now it's that the school district somehow by allowing a different viewpoint has done what other than recognize the First Amendment? What government speech is represented by a policy that lets opposing views be stated? The speech, Your Honor, in this one of the three factors of Walker, is the recognition by those in the public that the school district has allowed during the school day, while they're trying to conduct classes, the striking teachers to be on campus and thereby are condoning by not excluding them from campus the messages they are trying to convey. But so you're saying this condoning, this recognizing that there may be contrary views and permitting them to be expressed, that becomes speech itself? That suggests to me that if the White House decides we're sick and tired of these protests against our travel bans, we're going to outlaw any such demonstration on government property. And that itself is government speech that makes our prohibition of a contrary view effective. How could that possibly be correct? Can you give me any authority at all to support that proposition? I have no authority other than the argument I just offered. Then let's break it down. How is allowing a contrary viewpoint to be expressed itself government speech? Your Honor, all I can respond to you with is this statement. This is one of the three Walker factors. And of the three Walker factors in this case, not the most compelling. We do believe there is an argument that in the middle of a strike, when you have the teachers on the public sidewalk surrounding these campuses, that if the school district were to say it's okay in this collective bargaining dynamic. Your premise is that the school district has the right to say anything else. The point of this case is that the school district does not have that authority. So I don't understand how adopting the label government speech doctrine would give the school district more power than it would otherwise have. Let's look at the other two factors in Walker. One is the history of this district in terms of allowing public access to this campus. There is no evidence in this record that this district has ever allowed demonstrations, protests. But there is evidence of rules adopted immediately before this strike and rescinded immediately after this strike. Yes. It's hard not to say that, gee, the strike might have had something to do with those rules. The strike did have something to do with those rules. It had everything to do with the rules. Your Honor. So how can, because one of the things that that public forum analysis requires is that it be exercised in a viewpoint neutral manner. What was neutral about a set of rules specifically adopted in anticipation and rescinded following the termination of the strike? In the middle of a collective bargaining process and a strike, this is the employer on whose property the teachers wanted to bring their placards, their bullhorns and their signs. We believe, Your Honor, the district had a right under state law, given the fact its primary mission is to educate the students to conduct classes during the day without interference from strikers in the middle of the collective bargaining process. What evidence was offered up that there would actually be any disruption unless these rules had been enacted and enforced? I asked. The exclusion extended to striking teachers not being allowed onto campus to meet with who had kids in the school to meet in connection with their kids being in the school. This was very much aimed at the teachers that were striking and prevented them from doing things other parents could do. No parents could come onto the campus and give a contrary view either. These policies were neutral to that extent. What's neutral about saying you can't express a view contrary to that of the school district? Was there any regulation that said that somebody couldn't come onto campus to support the school district's position? They're covered by the same policy. They're covered by the same policy. And the fact of the matter is, Your Honor, the speech that we believe is the most important speech that qualifies under the government speech doctrine here is the statement this school district made that it's going to keep the schools open during the strike. Now, I asked the union president, this is ER-327, 328, how close to those buildings did you want to get? Answer, as close as we could. The magistrate, in what we believe was an erroneous departure from the analysis before him, believed there were pedagogical values in play. And in his words, this is ER-33, he said, what a fantastic opportunity this would be to have the school children on campus observe the Bill of Rights in practice. Nobody disputes that the Bill of Rights sanctions and allows expressive conduct. But the strikers were not advocating for the Bill of Rights. The strikers were advocating, as allowed under Oregon law, to induce and coerce the employer to change the conditions of employment. And the students, as far as the Bill of Rights experience goes, could go down to the sidewalk and see this expressive conduct coming and going into the school grounds. Your Honor, there has not been a single case cited by any of us in this matter in which a court has not allowed a school district to exclude speech contrary to what that district's message or preference may have been, even if we use a forum analysis. Is there anything ‑‑ let me just say, your time is running out. I just want to ask you one question. I am. Is there any material difference between the student's claim, Ms. Boyer's claim? Yes, sir. And the association's claim and Mr. Carroll's claim? The district court seemed to treat the student's claim a little bit differently in his analysis. Yes. Would that be different under the Washington? It's a totally different analysis. Why? I mean, just because it's a student on school property? It's a student speech issue. It has nothing to do with these policies that apply to the labor issues that were in play at that time. The student speech issues are governed by Monell. There were no individual defendants. How about under the Oregon Constitution? Would it be analyzed any differently than analyzing Eagle Point Education Association's claim? Under the Oregon Constitution, the result would be no different. That isolated incident of restraining a student's speech on the way into campus would not give rise to a private right of action for damages. It doesn't exist under Oregon constitutional law. And the claim made here primarily was the 1983 claim. Right. And our argument was you haven't established entity liability under Monell. Did you want to reserve the remainder of your time? Thank you, Mr. Russerew. Good afternoon, and may it please the Court. I'm Jason Walta. I'm appearing for the plaintiff at Pele's, Dave Carroll, Stacey Boyer, and the Eagle Point Education Association. We ask that the judgment below be affirmed. This case involves a raft of speech restrictions that were enacted, as the school district freely admits, including at this argument, that were enacted to stifle speech that might dilute, denounce, or contradict the district's position in a labor dispute with the union. What is your response to my question about where we start our analysis? Why shouldn't we start it with the state constitutional claim first? And if that supports the judgment, why wouldn't we stop there without reaching, without needing to reach, any Federal constitutional claims? Well, Your Honor, I do agree that the case is much easier under the Oregon constitution. As a former State court judge, I'm sure you know that its protections are much more expansive. But I don't think that the entire judgment can be affirmed under the Oregon. Students may be in a different position, I would think. The other issue is that all of the plaintiffs were awarded nominal damages, which is a form of relief that is not available under the Oregon constitution. And so there are claims for relief that rely only on the First Amendment. And also there is a fees under Oregon law. I'm sorry? Attorney's fees. Were attorney's fees available to you under Oregon law? They are not. So the fee award as well. And also we do have a declaration of the unconstitutionality that declares it unconstitutional under both the Oregon and the First Amendment, Oregon constitution and the First Amendment. So I do believe that both would need to be addressed. And, you know, in a sense, I think that as long as we arrive at the position that these are unconstitutional under the First Amendment, I think it kind of follows a fortiori that they're also unconstitutional under the Oregon constitution just because it affords broader and not more narrow protection in any case. I have a question concerning the student's claim, which is, I think, as Mr. Mercereau correctly said, a Monell type of claim. And what I'm wondering is whether it is undisputed for the purpose of summary judgment that the people who stopped her were acting pursuant to the policy or in violation of the policy. Because I think it seemed ambiguous to me as to whether they were actually acting as part of the Well, that's certainly been their argument on appeal. But I don't think that is in dispute or a disputable fact. I mean, first we have to start with the terms of the policy that are written very broadly. And the defendants have argued on appeal that the policy didn't apply to parking lots. And that's what their argument is. But the record does not support that. In fact, in the record you have an exchange between, and this is in the deposition you'll see at page 240 of the excerpts of record. And this is a question about the sign and banner policy, asking about the scope of it. Is it the buildings? Does it include parking lots? Did it include right out to the edge of the property line? What is your understanding of that? And this is the superintendent record responding, yes, to all of what you said. It is the facilities. It is the property line. Parking lots, any outer buildings, anything that's owned by the district. So the idea that it was, that it didn't extend to the parking lots doesn't really hold water. And there's further proof of that in the policy itself, which says that it applies to both owned and leased facilities. And the only leased facility at here was the, was the kind of parking area across the street. And so to the extent there is any claim that a policy didn't apply because it was in the parking lot. So is there any evidence in the record that when the security guards, this was a security guy that. Yes. That stopped her and wouldn't let her into the parking lot. Yeah. Is there anything in the record that says that the school district, somebody from the administration gave those guards sort of their marching orders? I don't know that there is, but you do have the policy itself that was, that was very broadly. And then. Is there anything in the record that shows that the policy was, you know, here's the current policy. Follow it. I don't know that there is, but what you have, what you certainly don't have is this kind of narrow gloss on the policy being announced any time before, after the fact in litigation. They can't point to anything saying that, well, yes, we passed this very broad policy that seems to apply anywhere and everywhere, but we didn't mean it. You characterize it as broad, but it prohibited picketing, which that car was not. And it did prohibit signs and banners. I suppose that counts as a sign or banner. So is that what you're relying on? Yeah. It was the sign policy. And, you know, of course, after it happened, she was approached by the assistant principal, and he did not say a mistake was made, yet that wasn't intended to apply to you. He told her that what she did was in violation of the rules in place for the strike. And that was principal, assistant principal Rupp, who approached her and told her that. So the idea that this was just the doing of a single rogue security guard does not hold up. Is that an inference that should be drawn at summary judgment? I don't think that that's really an inference. I think that they have really failed to produce any contrary evidence. The evidence is indisputable about what the policy says. The superintendent There's no declaration or statements at a deposition where they say, we never said anything to these security guards. We just wanted them there to keep the peace. I don't believe there is. But what you do have is the superintendent's own deposition testimony that says this applied everywhere. And nothing that it, you know. And when a school district enacts an extremely vague policy, they really shouldn't be able to benefit from the fact that it was applied unevenly, that its terms were ambiguous. They should not get a pass under Monell when that happens. This action that occurred here was authorized by the policy. Sotomayor Well, you have to say that if it's Monell, you have to say that the policy is the cause of the constitutional deprivation. Fisher Sure. But, you know, in any event, at the end of the day, what you have is a judgment that declares these unconstitutional, that awards these nominal damages. And you do have at least one plaintiff who is entitled to each one of these forms of relief. So I don't know that the Court really needs to linger too long over relief that applies to one plaintiff when other plaintiffs in the case are entitled to the same relief. I do want to touch on the government speech doctrine quickly just to highlight what the Supreme Court said most recently in Mattel v. Tam, because I think it bears a lot on what is being argued here. And there, of course, the Court held that this restriction in the Lanham Act prohibiting trademarks that disparage any group was a form of unconstitutional viewpoint discrimination, and the Court rejected the contention that this was just a restriction on government speech. And the Court went far out of its way to really discuss the dangers of overinterpreting the government speech doctrine. The Court said that it was susceptible to dangerous misuse. It said that if private speech could be treated as government speech, the government could silence or muffle expression of disfavored viewpoints. And whatever you want to say of the school district's government speech argument here, it would be a significant expansion on what the Court held in Walker. And the Tom Court said that Walker marks the outer bounds of the government speech doctrine. And the Court in Tom was particularly concerned about some of the implications of an expansive reading of the government speech doctrine. There, they were really concerned about what would happen to copyright law. But a few of the examples that the panel brought up earlier really show the dangers of expanding government speech doctrine in this case. You know, the Tinker Court, when it talked about public schools, said that they are, you know, not to become enclaves of totalitarianism. And that's always seemed like a very hyperbolic statement to me, but that is pretty much what the school district is asking for. They are asking for a scenario where any member of the public who comes onto school grounds can be conscripted as a government spokesperson, where anyone's property brought onto school grounds can be confiscated as a government billboard. And there are other kind of implications that this Court should be worried about as well. If you were to honor the school district's government speech argument here, it would call into question a whole raft of U.S. Supreme Court cases that would seem to be untenable at that point. Rumsfeld v. Fair, Rosenberger, Lanschapel, all of the cases where the Court talked about access to school property in terms of a limited public forum where viewpoint — where restrictions on viewpoint were impermissible. If this — if the school district's argument were to be adopted, all of those cases would seem to be questionable at that point. And what hangs over all of this case is not just an attempt to insulate the school from a viewpoint it dislikes, but an active attempt to intimidate striking teachers who wanted to express that viewpoint. The school already had in place policies that prevented disruption, and I want to be clear that the union and the plaintiffs were not challenging any of those policies that were in place earlier, and that would have easily protected the school from disruptive conduct or anything like that. It already had in place policies that protected its interests, but unlike any of those policies, the picketing resolution threatened to initiate complaint proceedings against any violations. The same resolution said that no violations will be tolerated. The school told striking teachers that untruthful picketing signs are unlawful, and the school leased property just so it could deprive teachers of a spot near the school to organize their pickets. And it told striking teachers that they would not even be able to visit their own school on that day. I'm sorry, you looked like you were about to ask a question. I'm just thinking about what you're saying, but I also have a question I wanted to ask you before you sit down. Your time is almost up. So if the only relief available under the Oregon Constitution is an injunction, would the case be moot under the Oregon Constitution? I mean, they rescinded the policy. I don't believe it is moot, Your Honor. What relief is there to be moot? Well, it's certainly not moot under their Federal claims. It wasn't my question. My question was under the Oregon Constitution. Would it be moot? I don't believe it is, because particularly for the union itself and for the teacher plaintiff who is the president of the union, this is kind of a classic case where voluntary cessation should not be treated as mooting a claim. Okay. The general rule is that voluntary cessation does not moot a claim and that, you know, and that the other side would have a heavy burden of showing that this kind of conduct could not reasonably be expected to recur. And in the Knox v. SEIU case from the Supreme Court, 2012, the Court really focused on whether the party had continued to advocate that their conduct was permissible. And here they are arguing not just that their conduct here was permissible, but that they can go much, much further. And recall that the union and the school district here are in, are kind of locked into a long-term relationship where they are required to engage in bargaining on an ongoing basis and renegotiate a collective bargaining agreement every single time. And so the pall of this kind of unconstitutional threat hangs over the entire relationship in the absence of an injunction. These strikes, if they occur, are often very short. This one was only 7 days. And could often occur, you know, could be decisive in a strike or could occur so quickly that it would be difficult to get them enjoined in time. So I think this is kind of a prime example of a situation where even though they voluntarily cease to do it. And shifting gears, one last point. The magistrate judge, when he did his analysis, when he examined the student's claim, he applied Tinker. And that is the correct framework. You agree with that? That's the, from looking at her claim under the Constitution, you look, you apply the principles. For the Federal claim, that's the correct framework. And I do think that it is telling that the school district has made no effort whatsoever to argue on the merits that these restrictions were constitutional as applied to students. I don't think they could. I think this Court's cases in Chandler v. McMinnville and Birch v. Baker are absolutely decisive on that issue. And so I think it is fitting that they did not attempt to argue it on the merits. I have just about wrapped up my time here. I thank you and ask you to affirm the district court's judgment. Thank you, counsel. Mr. Mercereau, you have some rebuttal time. Thank you, Your Honor. Judge Baez, ER 296 has reference to the communications between the security staff and district personnel. And I think you'll find that in that case, the building principal had no idea what the security people had said to this young woman. But that's the citation that you were looking for in the hearing. Thank you. Your Honors, this Court has had three separate occasions to look at the circumstances involving the authority of the school district to reject speech on campus. In DiLoretto in 1999, this Court affirmed a school district's authority to say to an advertiser, you're not going to put a Ten Commandments placard on our baseball field fence. You have authority to exclude that. That's the Ninth Circuit. In the Downs case in 2000, this Court affirmed a school district's authority to tell a teacher, you are not going to put on our bulletin board in the high school a message that contravenes our belief, our being the school district, on gay and lesbian rights. And then finally in 2011, after Summa, but before Walker, this Court found in the Pollway case that that school district had the authority to tell a high school teacher, you cannot put your materials relating to religion and patriotism in your high school classroom because it contravenes the message that we are trying to deliver to our students. All of those cases involved an exclusion of some kind of speech on campus. And we believe that if you look at the way this case evolved, in the trial court, the magistrate relied on the Arizona Life Coalition case. That's a 2008 decision that predated Walker. That was a specialty license plate case. Your Honor, we believe this case presents you with an opportunity to set the record straight and find that Arizona Life Coalition is no longer good law. It cannot be squared with Walker. In between the time that the magistrate gave his findings and recommendations and the Article III judge reviewed them, Walker was decided. And we cited Walker to the Article III judge, Judge McShane, and made the government speech argument. And he affirmed, of course, the magistrate. But for all those reasons, we believe that the government speech doctrine is something that this court has looked at and affirms the authority of this district while school is in process to exclude the disruptive behavior only on campus of a strike involving bullhorns, signs, and what have you. Can you point me to where in the record there was evidence of disruption? The district court, the report and recommendation adopted by the district court said in so many words that there was no indication of disruption. Where in the record is there evidence to the contrary? Well, there was not a claim here, Your Honors, that anybody tested the policy by going onto the school district property. Was there anything about anticipating disruption? The idea of the policies was to avoid the disruption. And can you point me to anything in the record that illustrates that or suggests what disruption was the concern of the school district? Yes, I believe there is. There is testimony from the superintendent, the building principal, that having the strikers on campus while the kids were in school, in classrooms, where they could hear the bullhorns, where their own teachers were striking and some were not. And to use the magistrate's pedagogical view, would it then be incumbent upon the district to put those who had crossed the picket lines in classes to discuss the Bill of Rights with these students, a countermeasure, if you will? Would the preexisting policies prohibiting disruption have permitted the school district to silence the bullhorns during teaching time so that it would be a quiet environment? In theory, on a given isolated basis, if the decision were made to try to ask the strikers, would you please be quiet? Would you turn the bullhorn off? Perhaps. But we don't think these cases What do you mean perhaps? Either the policies covered it or they didn't. Is that whether I don't think you have to wait for disruption, Your Honor. That's our argument. You don't have to wait. I'm trying to get an answer to the question whether the preexisting policies prohibited disruptions sufficiently to have allowed the district to say, you know, you're yelling into a classroom, stop yelling into the classroom. No. I don't believe so. I believe there's no policy that was preexisting about that. I don't believe that once a district has allowed in an ongoing teacher strike picketing on campus, that you can begin to parse it out and say there are ways to remediate the disruptive effects on campus. It is per se disruptive to allow striking teachers within sight of the students, within earshot of the students. And after all, Your Honor, what is the purpose of having the strikers on the campus in the first place? Who's the audience as opposed to the city sidewalks when the taxpayers are out there and presumably would begin to lever on the school board perhaps, its economic positions, vis-a-vis collective bargaining. But they wanted to come onto the campus and deliver this message depicted on the boards to those who chose not to strike or to the employer who disagrees with their collective bargaining positions or to the students. Thank you, counsel. The case just argued is submitted. We thank both counsel for their helpful arguments. And we will stand adjourned for this session, and we will return in a few minutes in our civilian clothes to speak with students and anyone else who wishes to remain.
judges: Graber, Paez, Clifton